## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HSK                                         :
                                            :
                                            :
                                            :
    v.                  :     Civil No. CCB-12-3373
                                            :
                                            :
PROVIDENT LIFE &                            :
ACCIDENT INSURANCE CO., et al.              :

## MEMORANDUM

HSK sues the Provident Life and Accident Insurance Co. ("Provident"), alleging failure

to pay him disability benefits in breach of an insurance contract.  And he sues Provident's parent

corporation, Unum Group ("Unum"), for allegedly interfering with that contract.  HSK now

moves for summary judgment on his breach of contract claim against Provident, while Unum

moves for summary judgment on HSK's claim of contractual interference.  Those motions have

been fully briefed, and no hearing is necessary to their resolution.  *See* Local Rule 105.6 (D. Md.

2014).[1]  For the reasons explained below, HSK's motion for summary judgment on the breach of

contract claim will be denied, while Unum's motion for summary judgment on the contractual

interference claim will be granted.

## BACKGROUND

Provident is the wholly owned subsidiary of Unum.  (*See* Opp. Unum Mot. Summ. J. Ex.

3, Roth Aff. ¶ 6, ECF No. 126-2.)  Unum controls Provident directly through its ownership of

over 80 percent of that firm's shares, and indirectly through two wholly-owned subsidiaries that

hold the remaining shares.  (*See* Opp. Unum Mot. Summ. J. Ex. 2, Roth Dep. 39:17–22, ECF No.

---

[1] Accordingly, Provident's requests for a hearing on both motions will be denied.  (*See* ECF Nos. 119-2, 129-4.)

126-1.)  Provident has no employees.  (*See* Roth Aff. ¶ 7.)  Pursuant to a contract between

Provident and Unum, Unum administers Provident's insurance policies.  (*See id.*)

In early 1995, Provident issued a disability insurance policy to HSK.  (*See* HSK Mot.

Partial Summ. J. Ex. 26, HSK Aff. ¶ 2, ECF No. 121-26.)  HSK has paid the premiums on that

policy ever since.  (*See id.* at ¶ 3.)  Under that policy, Provident promised, among other things, to

pay HSK certain specified benefits if he became "totally disabled," which "means that due to

Injuries or Sickness [HSK is] not able to perform the substantial and material duties of [his]

Occupation."  (*See* HSK Mot. Partial Summ. J. Ex. 1, Policy 4, ECF No. 121-1.)

On March 16, 2011, HSK sent Provident a notice that he was claiming disability benefits

under the policy, requesting the "proof of loss" forms necessary to document his disability.  (*See*

HSK Mot. Partial Summ. J. Ex. 5, Notice of Claim, ECF No. 121-5.)  HSK submitted those

proof of loss forms roughly three months later.  (*See* HSK Mot. Partial Summ. J. Ex. 2, Proof of

Loss Form, ECF No. 121-2.)  There, he stated that he had served as an executive in the mortgage

industry for 19 years.  (*See id.* at 8.)  Before the onset of his alleged disability, HSK worked in

both a managerial and a sales capacity at a firm in which he held a partnership interest,

supervising employee performance, budgeting, regulatory compliance, and business

development, as well as communicating with business partners, among other responsibilities.

(*See id.*)  HSK quit that job in early April on account of his alleged disability.  (*See id.* at 2.)

Provident accepted that proof of loss as complete.  (*See* HSK Mot. Partial Summ. J. Ex. 3,

Weissensee Dep. 104:5–7, ECF No. 121-3.)

On the proof of loss form, HSK's attending physician, psychiatrist Dr. Andrew Feinberg,

described HSK's disability on HSK's behalf.  Specifically, Feinberg indicated that HSK suffered

from "major depression, OCD [obsessive compulsive disorder], panic disorder, ADHD [attention

deficit hyperactivity disorder], phobias, generalized anxiety disorder [and] opioid dependence."

(Proof of Loss 12.)  Those conditions, Feinberg continued, left HSK with a "low mood, severe

anxiety, impaired concentration, impaired working memory, [and] panic attacks."  (*See id.*)  In

light of HSK's condition and symptoms, Feinberg opined that HSK "can[not] return to his

previous occupation without endangering his health."  (*See id.* at 13.)  After leaving his job,

HSK's symptoms improved, according to Feinberg.  (*See* HSK Mot. Partial Summ. J. Ex. 24,

Feinberg Aff. ¶ 10, ECF No. 121-24.)  HSK used his time away from work to volunteer at the

Humane Society, help care for his elderly grandfather, and play tournament poker, a new hobby.

(*See, e.g.*, Feinberg Aff. ¶ 11; HSK Mot. Partial Summ. J. Ex. 25, Citrenbaum Aff. ¶ 11, ECF

No. 121-25.)

        After receiving HSK's proof of loss form, Provident began to collect his medical records,

pursuant to an authorization included in his proof of loss.  (*See* Weissensee Dep. 210:17–18;

Proof of Loss 15; HSK Mot. Partial Summ. J. Ex. 4, Shea Dep. 42:19–43:3, 19–23, ECF No.

121-4.)[2]  It collected records maintained by Feinberg, as well as another mental health

practitioner treating HSK, psychologist Charles Citrenbaum, and other medical providers.  After

reviewing HSK's records, Provident's in-house medical specialist, Dr. Lloyd Price, observed that

Feinberg's records "do not document any change in insured's mental/functional status on/ around

[sic] 3/10/11, nor do they contain any recommendation that insured not continue to work."  (Opp.

HSK Mot. Partial Summ. J. Ex. 6, Price Review Notes at 4, ECF No. 129-3.)  And Price

commented on the vagueness of Feinberg's notes, alongside other alleged failings, which led

---

[2] While reviewing HSK's claim, Provident requested two 30-day extensions.  (*See* HSK Mot. Partial
Summ. J. Ex. 7, Weissensee Letter 7/8/11, ECF No. 121-7; HSK Mot. Partial Summ. J. Ex. 8, Weissensee Letter
8/3/11, ECF No. 121-8.)

Price to conclude that those records did not "establish[]" or "support[]" Feinberg's diagnosis "due to lack of clinical detail." (*See id.* at 4–5.) As Price explained at his deposition, his review of HSK's medical records suggested that HSK was not disabled, contrary to Feinberg's representations. (*See* HSK Mot. Partial Summ. J. Ex. 18, Price Dep. 175:3–5, ECF No. 121-18; *see also* HSK Mot. Partial Summ. J. Ex. 22, Shea Letter 9/6/11, ECF No. 121-22.)

Accordingly, Price sent Feinberg a letter requesting additional information. (*See* Opp. HSK Mot. Partial Summ. J. Ex. 8, Price Letter 7/25/11, ECF No. 129-3.) Feinberg responded that he had "recommended to [HSK] many times, on many different dates, that he should get out of his business, as the stress of his job was clearly contributing to his depression, anxiety, and obsessive rumination. The stress of his job was clearly a direct trigger for his symptoms, which were in turn, causing significant impairment both at work and at home." (*See* Opp. HSK Mot. Partial Summ. J. Ex. 9, Feinberg Letter 7/29/11, ECF No. 129-3.) Price deemed Feinberg's letter conclusory, (*see* Opp. HSK Mot. Partial Summ. J. Ex. 7, Price Dep. 147:23–24, ECF No. 129-3), and it did not alter Price's opinion. Given Price's disagreement with Feinberg's conclusion, Price recommended an independent examination that, in his words, would "act, in effect, as a tie breaker." (*Id.* at 176:1.)

Based on Price's recommendation, Provident "determined that additional information is needed to understand [HSK's] medical and functional status," and wrote HSK to request that he undergo a "Psychiatric Independent Medical Exam." (HSK Mot. Partial Summ. J. Ex. 9, Weissensee Letter 8/10/11, ECF No. 121-9.)[3] Soon thereafter, HSK's attorney responded that

---

[3] Pending completion of that exam and further review of HSK's condition, Provident paid him one month's worth of benefits, reserving its right to contest past, present, or future liability for benefits. (*See id.*) Provident subsequently made two more payments subject to that same reservation of rights. (*See* HSK Mot. Partial Summ. J. Ex. 27, Shea Letter 9/19/11, ECF No. 121-27; HSK Mot. Partial Summ. J. Ex. 14, Shea Letter 11/8/11, ECF No.

the policy authorized Provident to demand only a physical examination, not a psychiatric

examination.  (*See* HSK Mot. Partial Summ. J. Ex. 11, McCauley Letter 8/18/11, ECF No. 121-

11.)  On that ground, HSK declined to submit to the examination Provident had requested.  (*See*

*id.*)

In internal correspondence, the insurance adjustor handling HSK's claim determined that

Provident was "unable to complete [its] evaluation of [HSK's] medical condition" without an

independent examination.  (HSK Mot. Partial Summ. J. Ex. 12, Shea Communication 11/1/11,

ECF No. 121-12.)  She thus recommended "paying benefits to date and closing his claim based

on the Insured not complying with the terms of the policy."  (*Id.*)  An internal review of that

recommendation noted that Provident believed that its "right to obtain an [independent medical

examination] is clear, and we are unable to assess our liability without an [independent medical

examination]."  (HSK Mot. Partial Summ. J. Ex. 13, QCC Review, ECF No. 121-13.)

In early November, on the basis of those internal deliberations, Provident informed

HSK's attorney that it would deny HSK's claim for benefits:

> The available medical information does not support [HSK's] contention that he
> cannot perform the duties of his occupation.  [HSK], through your office, has
> stated he will not attend an Independent Medical Examination (IME) that would
> allow us to gather the information needed to assess his eligibility for benefits.
> Without additional information, [HSK] is not eligible for benefits at this time.

(HSK Mot. Partial Summ. J. Ex. 13, Shea Letter 11/8/11 at 2, ECF No. 121-13.)  Price's review

of HSK's medical files, the letter continued in greater detail, indicated "that there has not been

any change in [HSK's] mental/functional status on or around March 10, 2011, nor do they

---

121-14.)  Roughly one month after requesting the psychiatric exam, Provident refunded the premium payment HSK
had submitted in August of that year, explaining that he was "qualified for a refund of premiums paid since [his]
disability began."  (HSK Mot. Partial Summ. J. Ex. 10, Letter 9/14/11, ECF No. 121-10.)  The letter conveying that
information included no express reservation of rights.  (*See id.*)  Although HSK emphasizes that oversight in his
motion, he does not expressly seek summary judgment on the basis of estoppel or any similar doctrine.

contain any recommendation that he does not continue to work." (*Id.*)  And Provident believed

that the subsequent letter from Feinberg provided neither additional medical data nor explained

why HSK could not return to work in light of his recently "improved clinical state and

anticipated ongoing treatment." (*Id.* at 2–3.)  For these reasons, Provident requested an

examination.  Without such an examination, the letter explained, "the information in our claim

file does not support that [HSK] is restricted and/or limited from a psychiatric standpoint. . . .

Therefore, as [HSK] is not in compliance with [his] policy, and our . . . review does not support

[HSK's] restrictions and limitations, our ongoing assessment of further benefits is complete and

further benefits are not payable to him." (*Id.* at 3.)  An internal auditor later corroborated that

explanation for the denial of HSK's benefits.  After reviewing HSK's file pursuant to Provident's

internal procedures, the auditor determined that "we made the decision that the claimant wasn't

disabled based on the information we had and that the claimant had failed to submit to the

[independent medical examination] also." (HSK Mot. Partial Summ. J. Ex. 15, Marley Dep.

83:8–11, ECF No. 121-15; *see also* HSK Mot. Partial Summ. J. Ex. 16, Audit Document, ECF

No. 121-16.)

 During the pendency of this litigation, Provident solicited the opinion of another

psychiatrist, Dr. Thomas Oglesby, who reviewed HSK's medical records, the opinions of the

mental health professionals treating HSK, video of HSK's deposition, and other materials. (*See*

Opp. HSK Mot. Partial Summ. J. Ex. 17, Oglesby Report 1–2, ECF No. 129-3.)  Oglesby

concluded that HSK displayed "usually mild" symptoms of obsessive compulsive disorder,

"usually mild to moderate" anxiety, "sporadic panic attacks," "intelligen[ce] and . . . an excellent

memory." (*Id.* at 5.)  Because "[t]here was no significant change in his symptoms or treatment in

2011" and because HSK "described himself as an important part of his company," Oglesby

concluded that HSK "is capable of working in his occupation as a mortgage executive,"

notwithstanding those generally mild symptoms. (*Id.* at 5–6.)

HSK filed this lawsuit in Maryland's Circuit Court for Baltimore City, alleging that

Provident breached its insurance contract with him. (*See* Compl., ECF No. 1.) After Provident

removed the case to this court, (*see* Notice of Removal, ECF No. 1), HSK filed, with the court's

permission, an amended complaint, adding the claim that Unum tortiously interfered with his

contract. (*See* Am. Compl., ECF No. 64.) On the parties' request, this court interpreted HSK's

policy, concluding that it does not permit Provident to "deny benefits on the ground that HSK

failed to submit to a psychiatric examination." (Mem. 11, ECF No. 44.) The parties

subsequently engaged in discovery. These motions for summary judgment followed.

## ANALYSIS

### I. Standard of Review

As noted, both parties move for summary judgment on separate claims. Federal Rule of

Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows

that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable

jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d

308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th

Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing

law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly,

"the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment . . . ."  *Anderson*, 477 U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## II. Breach of Contract

HSK seeks summary judgment on the ground that Provident premised its denial of disability benefits on a misinterpretation of his obligations under the policy.  On his reading of the record, Provident denied him benefits solely because of his refusal to submit to an independent psychiatric exam.  As noted, this court previously determined that HSK's policy did not condition benefits on his submission to such an exam.  (*See* Mem. 11.)  Accordingly, HSK concludes that his denial of benefits was wrongful.

Provident retorts that HSK misunderstands the basis of its benefits determination.  On Provident's account, it demanded an independent evaluation of HSK's condition only because the evidence he had previously submitted was inadequate to verify his entitlement to benefits.  HSK's refusal to augment that inadequate record with an independent psychiatric examination thus amounted to a failure of proof, justifying the denial of benefits.

A jury might well credit Provident's reading of the record.  The benefits specialist evaluating HSK's claim explained that, absent an independent evaluation, Provident "did not

have clarification if he had any restrictions and limitations" on his ability to perform the duties of

his occupation.  (Shea Dep. 103:1–2.)  A contemporaneous letter sent to HSK's attorney

corroborates this account.  There, the benefits specialist explained that an independent evaluation

was necessary to "provide clarification of the questions that [Provident's medical expert]

continues to have" about HSK's condition.  (Shea Letter 9/6/11 at 1.)  Failure to provide

additional information, the letter continued, may leave Provident "unable to evaluate [HSK's]

ongoing eligibility for benefits."  (*Id.* at 2.)  The letter explaining Provident's denial of benefits

reiterated these rationales:  "The available medical information does not support [HSK's]

contention that he cannot perform the duties of his occupation . . . . Without additional

information, [HSK] is not eligible for benefits at this time."  (Shea Letter 11/8/11 at 2.)  And

Provident's internal audit explained that the preliminary review of HSK's claim for benefits did

not support his assertion of disability "based on the available information" and that, without an

independent evaluation, "we were unable to gather the information necessary to determine

whether the claimant was disabled."  (Audit Document 3.)

     HSK responds that the theory Provident now advances is inconsistent with the testimony

of its designated corporate representatives.  Federal Rule of Civil Procedure 30(b)(6) obligates

corporations and other entities named in a notice or subpoena to designate persons "to testify on

its behalf" on certain specified matters.  "The persons designated must testify about information

known or reasonably available to the organization."  *Id.*  The corporation thus "has a duty 'to

prepare the designees so that they may give knowledgeable and *binding* answers for the

corporation.'"  *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 504 (D. Md. 2000)

(emphasis added) (quoting *United States v. Taylor*, 166 F.R.D. 356, 360–61 (M.D.N.C. 1996)).

But even assuming Provident is "bound" by its designee's answers,[4] its opposition to summary judgment does not contradict that testimony. One of Provident's designees, Marley, testified at his deposition that HSK's denial of benefits "wasn't a proof of loss denial," meaning that "it wasn't a claim where we had followed our proof of loss procedures and denied the claim on the basis of a failure to provide proof of that claim . . . ." (Marley Dep. 82:24, 83:5–8.)[5] HSK interprets that response to mean that Provident did not deny his claim for some *substantive* failure to prove that he was disabled. But it might just as well mean that Provident did not deny his claim for failure to comply with its proof of loss *procedures* related to the submission of a complete proof of loss form. Indeed, that latter view is more consistent with Marley's subsequent explanation that "we made the decision that the claimant wasn't disabled *based on the information we had* and that the claimant had failed to submit to the IME also." (*Id.* at 83:8– 11 (emphasis added).) In other words, Marley expressly indicated that Provident premised its

---

[4] The extent to which a corporation is "bound" by its designee's answers is by no means clear. HSK cites an unpublished case that precluded a corporation from relying on information its designee had suggested was unknown at the time of its deposition. *See Chapman v. Ourisman Chevrolet Co.*, Civ. No. AW-08-2545, 2011 WL 2651867, at *3–5 (D. Md. July 1, 2011). That case thus applied a rule intended to prevent sandbagging "during discovery, then staging an ambush during a later phase of the case." *Rainey v. Am. Forest & Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 95 (D.D.C. 1998). And this court has prohibited corporations from contradicting their designee's testimony with subsequently executed affidavits, which is consistent with the "general proposition [that] a party may not submit an affidavit or declaration at the summary judgment stage contradicting its earlier deposition testimony." *TEKsystems, Inc. v. Bolton*, Civ. No. RDB-08-3099, 2010 WL 447782, at *8 (D. Md. Feb. 4, 2010) (quoting *Caraustar Indus., Inc. v. N. Ga. Converting, Inc.*, Civ. No. 3:04CV187-H, 2006 WL 3751453, at *6 (W.D.N.C. Dec. 19, 2006)). Nevertheless, a corporate designee cannot "bind" the corporation to *legal* conclusions, *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 229 n.9 (3d Cir. 2009), and "likely does not bind [an entity] in the sense of a judicial admission," *S. Wine & Spirits of Am. Inc. v. Div. of Alcohol & Tobacco Control*, 731 F.3d 799, 811 (8th Cir. 2013).

[5] HSK fails to include in the record any indication of the precise subjects about which Provident designated Marley to testify. That oversight matters, because Marley's testimony is not "binding"—whatever that might mean—to the extent it impinges on matters beyond the scope of Provident's designation. *See, e.g.*, *Philbrick v. eNom, Inc.*, 593 F. Supp. 2d 352, 363 (D.N.H. 2009).

Relatedly, HSK asserts that Provident's litigation position is inconsistent with the testimony of another of its designees, Belanger, who allegedly "confirmed that the company could *not* have simply denied the claim without an [independent medical exam] to break the 'tie' between HSK's treatment providers and UNUM's On-Site Physician." (Reply HSK Mot. Partial Summ. J. 17.) For support, HSK cites pages 82 and 83 of Belanger's deposition, but fails to include those pages in the record. That omission prevents the court from evaluating HSK's argument as to Belanger's deposition testimony. And, as with Marley, HSK has not described the subjects on which Provident designated Belanger to testify.

decision at least in part on a *substantive* failure of proof, as Provident now argues in opposition to summary judgment.

HSK next asserts that the burden of proving ineligibility for benefits lies with Provident, which thus must pay him disability in the event of a failure of proof.[6]  HSK bases that allocation of the burden on Provident's acceptance of his proof of loss form.  In his view, Provident's acceptance of that form as complete established a prima facie case for benefits, which Provident now bears the burden of rebutting.

None of the cases on which HSK relies, however, establish such a burden-shifting framework.  Generally, the burden of proving entitlement to insurance benefits lies with the insured.  *See, e.g.*, *Vargo v. N.Y. Life Ins. Co.*, 180 F. Supp. 638, 640 (D. Md. 1959) (applying Maryland law); *Commercial Cas. Ins. Co. v. Zajic*, 1 A.2d 903, 906 (Md. 1938) (applying this allocation of the burden of proof in the context of disability insurance).  HSK invokes a series of cases altering that generally applicable rule for reasons unrelated to submission of a proof of loss form.  *New York Life Ins. Co. v. Harvey*—an unpublished table disposition—placed the burden of proof on an insurer seeking a declaratory injunction.  155 F.3d 560 (4th Cir. 1998) (per curiam).[7]  *Lasser v. Reliance Standard Life Insurance Co.*—which HSK invokes for the first

---

[6] HSK also invokes *Curry v. Trustmark Insurance Company*—an unpublished decision—to argue "that after Plaintiff submitted a written notice of claim and written proof of loss . . . Defendants had independent obligations to pay Benefits to Plaintiff every 30 days for the duration of his disability." Civil No. JKB-11-2069, 2013 WL 3716413, at *3 (D. Md. July 15, 2013).  But that observation pertained only to the time at which an insured's cause of action accrued, not to the allocation of the burden of proof.  And the Fourth Circuit later reversed *Curry*'s endorsement of the continuing breach theory of accrual.  *See Curry v. Trustmark Ins. Co.*, 600 F. App'x 877, 881 (4th Cir. 2015).  In any case, *Curry* observed that the *adequacy* of an insured's proof of loss—the same defense asserted here—"would likely be a question for the jury," as HSK recognizes in a footnote.  2013 WL 3716413, at *4.

[7] In support of that allocation of burdens, *Harvey* cited *Maryland Casualty Co. v. Baldwin*, 357 F.2d 338, 339 (4th Cir. 1966) (per curiam), another action initiated by an insurer seeking declaratory judgment.  Traditionally, a "well-developed line of authority . . . h[eld] that a plaintiff in a declaratory judgment action who voluntarily goes forward and attempts to prove his case will be held to have assumed the risk of nonpersuasion."  10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2770 (3d ed. 1998).  But courts never embraced that rule uniformly.  *See id.*  And, in any case, it is no longer viable in light of *Medtronic, Inc. v. Mirowski*

11

time in his reply—explained that "the burden of proving disability ultimately lies with" the

insured and relieved the insured of that burden only to the extent that "the insurer wishes to call

into question the *scientific basis*" of the insured's medical expert's reports.  344 F.3d 381, 392

(3d Cir. 2003) (emphasis added).  That case's emphasis on "scientific" matters related to its

refusal to force the insured "to provide statistics detailing the harm that working in his regular

occupation might precipitate," reasoning that "[m]ost disability claimants will not have the

means at their disposal (financial or otherwise) to obtain this kind of evidence."  *Id.*  And HSK's

remaining cases shift the burden to insurers seeking to prove an *affirmative defense*,[8] which is

consistent with the ordinary rule that "it is incumbent on the defendant to plead and prove such a

defense . . . ."  *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008).  Here, by contrast, Provident does

not seek a declaratory judgment, does not dispute the underlying scientific principles on which

HSK's treating physicians relied in declaring him disabled, and does not assert an affirmative

defense.

      HSK argues that the policy, Provident's proof of loss forms, and its manual all imply that

---

*Family Ventures, LLC*, 134 S. Ct. 843 (2014).  There, the Supreme Court held that a patentee defending its entitlements in an action seeking declaratory judgment of noninfringement retained the burden of proving infringement.  *See id.* at 849.  It reasoned, in part, that the Declaratory Judgment Act is a procedural device that does not alter substantive rights, such as the burden of proof.  *See id.*

    [8] Specifically, HSK cites the following decisions: *Mut. Fire Ins. Co. of Calvert Cnty. v. Ackerman*, 872 A.2d 110, 114 (Md. Ct. Spec. App. 2005) (explaining that the insurer bears the burden of proving that the policy was no longer effective "because this contention was in the nature of an affirmative defense"); *Choice Hotels Int'l, Inc. v. Madison Three, Inc.*, 83 F. Supp. 2d 602, 603 (D. Md. 2000) (explaining that, under Maryland law, the burden of proving an affirmative defense in a breach of contract case lies with the defendant).

    HSK also invokes several cases from other jurisdictions.  None apply Maryland law.  And even if they did, none would be especially helpful here.  *See Weeks v. Aetna Ins. Co.*, 501 N.E.2d 349, 352 (Ill. 1986) (holding that, under Illinois law, an insurer had the burden of proving that the insured was no longer disabled after the insurer had formally acknowledged his disability and paid him benefits for 261 months); *Am. Nat'l Ins. Co. v. Points*, 131 S.W.2d 983, 989 (Tex. Civ. App. 1939) (explaining that the burden of proof under Texas law is on the defendant to prove an affirmative defense); *Metro. Life Ins. Co. v. Reynolds*, 60 P.2d 1070, 1072 (Ariz. 1936) (assigning to the defendant the burden of proving that plaintiff's disability arose before the effective date of the policy, where the evidence demonstrated that the plaintiff "was in good health when the policies were issued, and had been able to manage his mercantile business for five years before and nine years after the date of the policies").

it carries the burden of proving HSK's ineligibility.  Not so.  The policy merely provides Provident the right to have HSK physically examined, and the proof of loss form merely contains an authorization enabling Provident to gather HSK's medical records.  The policy provision and authorization thus enable Provident to verify to its satisfaction HSK's alleged disability, without releasing HSK from his burden of proving disability after Provident accepts his proof of loss form as complete.  Put differently, those documents authorize Provident to confirm or rebut the factual bases of an insured's claim, without relieving the insured of its obligation to produce sufficient facts in the first instance.  And Provident's internal manual only directs its claims handlers to consider paying customers benefits under a reservation of rights while Provident continues "to evaluate a claim when liability or continued liability is unclear."  (HSK Mot. Partial Summ. J. Ex. 17, Reservation of Rights Policy 2, ECF No. 121-17.)  That policy enables Provident to pay benefits pending a full evaluation of the substance of the insured's proof without risk that it will be estopped from later denying benefits.  It does not alter the burden of proof.

In his reply brief, HSK argues for the first time that Provident was contractually obligated to obtain an additional medical opinion about his condition before denying him benefits.  That alleged obligation derives not from the policy but from a settlement agreement between Provident and 49 state insurance regulators, which was executed in late 2004.  (Reply HSK Mot. Partial Summ. J. Ex. 42, Settlement Agreement, ECF No. 136-3.)  The report accompanying that agreement indicated that Provident had excessively relied on its own in-house medical staff to evaluate claims, which "often resulted in a Company bias and the inappropriate interpretation or construction of medical reports, to the detriment of claimants."  (Reply HSK Mot. Partial Summ.

J. Ex. 41, Report 7, ECF No. 136-2.)  Accordingly, the settlement agreement requires Provident

to seek out an independent medical opinion to resolve any disagreement between a claimant's

treating physicians and Provident's in-house medical staff as to the claimaint's condition.  (*See*

Settlement Agreement Ex. 6.)  Where, as here, no such independent medical exam is possible,

the agreement obligates Provident to seek the opinion of its Chief Medical Officer or a specialist

designated by that officer to resolve such a disagreement.  Provident appears to have sought no

such review here.[9]

To the extent HSK attempts to diminish Provident's credibility by demonstrating that

Provident did not comply with its internal procedures in denying his claim, that is a matter

reserved for the jury.  *See, e.g.*, *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th

Cir. 2014).  To the extent HSK suggests that Provident's non-compliance with the settlement

agreement is an independent basis for liability, that argument is procedurally improper.  By

waiting to raise it until his reply brief, HSK deprived Provident of an opportunity to respond, and

deprived this court of the benefit of any such response.  *See, e.g.*, *Clawson v. FedEx Ground*

*Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts

is that an argument raised for the first time in a reply brief or memorandum will not be

considered.").  In any case, breach of the settlement agreement would probably not generate

liability under HSK's freestanding policy.  Even if HSK were a third-party beneficiary of that

settlement agreement—as he suggests—then that status would likely authorize him to enforce the

settlement, perhaps via the specific remedial provisions it contains.  (*See* Settlement Agreement

26–29.)  It would not seem to entitle him to damages on his freestanding insurance policy.

Last, HSK objects to several of Provident's characterizations of the record, some of

---

[9] Provident did seek an independent medical examination, as noted, but HSK refused to participate.

which mirror the grounds on which Provident arguably denied HSK's claim.  (*See* Reply HSK

Mot. Partial Summ. J. 4–9.)  For example, the letter explaining that determination to HSK

indicated that HSK's medical records do not indicate "that there has not been any change in

[HSK's] mental/functional status on or around March 10, 2011," (Shea Letter 11/8/11 at 2), an

assertion Provident repeats before this court, (*see* Opp. HSK Mot. Partial Summ. J. 6).  HSK, in

turn, highlights several passages in his medical records, including records generated by

Citrenbaum, indicating that his symptoms worsened in the months before he left his job.  (*See*

Reply HSK Mot. Partial Summ. J. 7–8.)  In a similar fashion, HSK disputes Provident's assertion

that his medical records lack any indication that his treating physicians advised him to leave his

employment, lack independent verification of his condition, or fail to suggest that he could not

perform his job functions, to name just a few additional examples.  All of these arguments may

well convince a jury.  But "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge'"

considering a motion for summary judgment.  *McAirlaids*, 756 F.3d at 310 (quoting *Anderson*,

477 U.S. at 255).

 For these reasons, HSK's motion for summary judgment on his breach of contract claim

will be denied.

**III. Intentional Interference with Contract**

 As noted, Unum seeks summary judgment on HSK's claim that it intentionally interfered

with his insurance contract with Provident.  That claim is premised on the allegation that Unum

"usurp[ed] Provident's role in evaluating and investigating [HSK's] claim for disability benefits"

under the insurance contract, ultimately inducing Provident to breach that agreement.  (Amended

Compl. ¶¶ 24–26.)  On that basis, HSK augments his request for a compensatory award with a demand for punitive damages.  As explained below, that claim fails on the ground that Unum, as Provident's controlling parent corporation, possessed a privilege to interfere in Provident's existing contracts.

Unum asserts that the parent-subsidiary privilege insulates it from liability for its alleged interference with the contract between HSK and Provident.  The Maryland Court of Appeals has never squarely recognized the privilege Unum invokes.  Under that circumstance, this court is "called upon to predict how [the Maryland Court of Appeals] would rule if presented with the issue." *Ellis v. Grant Thornton LLP*, 530 F.3d 280, 287 (4th Cir. 2008).  "To forecast a decision of the state's highest court [federal courts] can consider, *inter alia*: canons of construction, restatements of the law, treaties, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions." *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999).

Here, the Court of Appeals' description of the policies informing the doctrine of tortious interference with business relationships suggests that it would endorse the majority rule, under which a parent corporation is privileged to interfere with its subsidiary's contracts.  As that court has explained, "[t]ortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship . . . and the interferer . . . ." *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 973 (Md. 1989).  By contrast, "[a] two party situation is entirely different.  If D interferes with D's own contract with P, D does not, on that ground alone, commit tortious interference, and P's remedy is for breach of the contract between P and D." *Id.* at 974.  As the Court of Appeals observed in *Alexander &*

*Alexander Inc. v. B. Dixon Evander & Associates, Inc.*, 650 A.2d 260, 272 n.21 (Md. 1994), "it could be argued that th[is] analytical framework . . . does not exist where the entity that controls a corporation is sued for interfering with that corporation's contracts."  For support, *Alexander* cited *Deuville Corp. v. Federated Department Stores, Inc.*, 756 F.2d 1183, 1197 (5th Cir. 1985), which observed that "the interests of [parent and subsidiary] are aligned so closely that we have difficulty even recognizing their separate identities for the purpose of this [tortious interference] analysis."  For those reasons, *Alexander* explained that "[a] parent corporation is generally justified in requiring its subsidiary to modify economic arrangements, contractual or otherwise, if those arrangements do not benefit the parent."  650 A.2d at 272.   Notwithstanding these observations, however, the Court of Appeals did not embrace the parent-subsidiary privilege in *Alexander*; it reserved that question for another day, deciding the dispute before it on alternative grounds.  *See Alexander*, 650 A.2d at 272 n.21.

Other courts, however, have endorsed the privilege that *Alexander* tentatively explored. Reviewing the legal landscape in 1995, the Second Circuit explained that "[c]ourts in other states have *uniformly* found that a parent company does not engage in tortious conduct when it directs its wholly-owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform."  *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995) (emphasis added) (predicting Connecticut law).  It emphasized the "significant unity of interest between a corporation and its sole shareholder—indeed, an even greater unity than that which exists between a corporation and its agents or officers."  *Id.*  In the intervening two decades, that judicial consensus has expanded.[10]  And academic commentary confirms that

---

[10] *See, e.g., Servo Kinetics, Inc. v. Tokyo Precisions Instruments Co.*, 475 F.3d 783, 800–01 (6th Cir. 2007) (predicting Michigan law); *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 781–82 (Tenn. 2000); *Truckstop.Net, LLC v. Sprint Commc'ns Co.*, 537 F. Supp. 2d 1126, 1140–41 (D. Idaho 2008) (predicting

consensus.[11]

Similarly, the parent-subsidiary privilege helps preserve the distinction between actions

sounding in contract and in tort.  That distinction is significant: "A successful plaintiff in a

tortious interference case is not limited to the contract measure of damages, the benefit of the

bargain, but can recover 'the more extensive tort damages,'" including a punitive award.

*Alexander*, 650 A.2d at 270 (internal citations omitted) (quoting *Rite Aid Corp. v. Lake Shore

Inv.*, 471 A.2d 735, 740–41 (Md. 1984)).  For this reason, the Court of Appeals "has refused to

adopt any theory of tortious interference with contract or with economic relations that 'converts a

breach of contract into an intentional tort.'"  *Id.* at 269–70 (quoting *K & K Mgmt.*, 557 A.2d at

981).

While HSK makes several arguments against this result, he cites not a single case—in

Maryland or elsewhere—rejecting the parent-subsidiary privilege.[12]

Accordingly, the court predicts that the Maryland Court of Appeals would endorse the

parent-subsidiary privilege in the context of interference with existing, non-terminable

---

Idaho law); *MGP Ingredients, Inc. v. Mars, Inc.*, 465 F. Supp. 2d 1109, 1115 (D. Kan. 2006) (predicting Kansas law).

[11] *See, e.g.*, 9 Stuart M. Speiser, Charles F. Kraus, & Alfred W. Gans, *The American Law of Torts* § 31:58 (2012) ("In general, a parent company has a qualified privilege to interfere in the contractual relations of  a wholly owned subsidiary company."); Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, *The Law of Torts* § 636 (2d ed. 2015) ("Most courts . . . say . . . that the parent may be privileged to interfere, or that interference is not wrongful unless accomplished through improper means or motive.").

[12] HSK invokes *Damazo v. Wahby*, 270 A.2d 814 (Md. 1970), claiming that "it affirmed a judgment holding a controlling shareholder liable for tortious interference with his corporation's contract with the plaintiff," (Opp. Unum Mot. Summ. J. 2).  But in fact *Damazo* "remanded without affirmance or reversal . . . for further proceedings and the rendering of new judgments consistent with the views and holdings of the opinion herein . . . ." *Id.* at 820.  As to the tortious interference claim, the decision's holding was ambiguous.  Although the controlling shareholder asserted that the plaintiff "did not plead or seek damages against [him] for tortious interference," the Court of Appeals held that argument "immaterial in the view we take and the disposition we will make of the case." *Id.* at 818.  Later in the opinion, however, it explained that the trial court should have "realized . . . that [the controlling shareholder] could not be held liable at all under the interference count of [the plaintiff's] declaration." *Id.* at 820.  In any case, *Damazo* never so much as mentioned the parent-subsidiary privilege, let alone rejected it.

contracts.[13]

Although every court to have considered the parent-subsidiary privilege appears to endorse it, authority is split on the scope of protection it provides.  While some courts treat that privilege as an absolute bar to liability, others describe its protections as limited, holding "that a parent corporation can be held liable for interfering with the economic relations of its subsidiary if that corporation employs improper means or acts with an improper purpose."  *See Rentokil Initial (1896) Ltd. v. Jeld-Wen, Inc.*, Civ. No. 1:12-cv-01307-CL, 2013 WL 869518, at *2 (D. Or. Mar. 6, 2013) (collecting cases); *see also* Dan B. Dobbs, Paul T. Hayden, & Ellen M. Bublick, *The Law of Torts* § 636 (2d ed.  2015).  The parties have not briefed this issue; they argue only the prior question whether Maryland courts would recognize the parent-subsidiary privilege, without discussing the scope of that privilege.[14]  In any case, the court need not decide whether Maryland courts would endorse an absolute or limited privilege, because Unum's conduct falls within even the limited privilege.

As the Second Circuit has explained, "[m]ost states" that recognize the privilege refuse to apply it to "sufficiently egregious" behavior, which comports with the more general rule of Connecticut law "that actions involving 'fraud, misrepresentation, intimidation or molestation' or 'malic[e]' may give rise to a claim of tortious interference with contract."  *Boulevard Assocs.*, 72

---

[13] Although HSK asks for this question to be certified to the Maryland Court of Appeals, the court declines to do so.  "Only if the available state law is clearly insufficient should the court certify the issue to the state court." *Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994).  Put differently, "[c]ertification is unnecessary when existing authority permits the court to reach a 'reasoned and principled conclusion.'"  *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 622 (D. Md. 2013).  The court concludes that existing authorities are more than adequate to permit principled resolution of this case.

[14] At best, HSK argues that Unum's invocation of the privilege fails because it has not "identif[ied] a legitimate financial interest that would be prejudiced by Provident's performance of its contractual obligations, prov[en] that it acted in the good faith belief that its actions were required to protect this interest, and establish[ed] that it did not employ wrongful means in its interference with the contract."  (Opp. Unum Mot. Summ. J. 32.)  Even if that were the law—which this court does not decide—then Unum has satisfied its burden.  Unum's ownership of Provident gave it "a direct financial stake" in Provident's administration of its insurance policies.  *Alexander*, 650 A.2d at 259.  And, as explained in the body of the memorandum, there is no indication that Unum acted with sufficient culpability to deprive it of the parent-subsidiary privilege.

F.3d at 1037 (quoting *Kecko Piping Co. v. Town of Monroe*, 374 A.3d 179, 182 (Conn. 1977)).[15] By way of example, the Second Circuit speculated that coercing a subsidiary to breach its contract "at gunpoint" or via "fraudulent misrepresentations" might satisfy that standard.  *Id.*  By contrast, it *held* that a parent company's conduct was protected by the limited privilege where it "simply directed its subsidiary, as it could do through the appropriate channels of corporate command, to stop paying the rent" it owed under a binding but unprofitable contract.  *Id.*

Unum's conduct is, if anything, less culpable.  Nothing in the record indicates that Unum coerced, defrauded, or otherwise manipulated Provident.  To the contrary, it merely administered its interpretation of Provident's agreement with HSK, pursuant to a separate contract between Unum and Provident.  In a separate context, HSK asserts that Unum's administration of his contract with Provident was "wrongful" to the extent Unum misinterpreted that agreement or denied him benefits on allegedly pretextual grounds.[16]  But that allegedly wrongful conduct was directed at HSK, not Provident.  *See Boulevard*, 72 F.3d at 1037 (noting that a plaintiff must prove that the parent company wrongfully coerced its subsidiary, not the third-party to whom the subsidiary was contractually obligated).  Even were it otherwise, it would not rise to the level of egregiousness sufficient to vitiate Unum's limited privilege.  Contractual misinterpretation is a far cry from deliberately breaching an unprofitable contract, let alone employing physical violence or fraud to induce a breach.  *Compare id.*

For these reasons, the court will grant summary judgment to Unum on Provident's tortious interference claim.

---

[15] The parties dispute whether Maryland law applies a similar standard to claims for interference with an existing contract or, instead, limit it to claims for interference with prospective contracts.  That dispute has no bearing on the scope of the parent-subsidiary privilege, which the parties have not briefed.

[16] HSK advances that argument to rebut Unum's contention that, even absent any parent-subsidiary privilege, its conduct was not tortious.

**CONCLUSION**

For the reasons stated above, the court will deny HSK's motion for summary judgment

on his breach of contract claim, and will grant summary judgment to Unum on HSK's claim of

intentional interference with contract.

A separate order follows.


<u>August 31, 2015</u>                                      <u>                    /S/                    </u>
Date                                                                   Catherine C. Blake
                                                                       United States District Judge